**FILED**

SEP **13** 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DWAYNE JONES,

      Petitioner,      No. CIV S-08-1854-GEB-TJB

      vs.

D. K. SISTO,

      Respondent.      ORDER AND FINDINGS AND RECOMMENDATIONS

_____/

## I. INTRODUCTION

Petitioner Dwayne Jones is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Based on a thorough review of the record and the applicable law, this Court: (1) denies Petitioner's requests; and (2) recommends that habeas, declaratory, and injunctive relief be denied.

## II. PROCEDURAL HISTORY

Petitioner is currently serving a sentence of 15 years to life following his 1996 conviction for second degree murder in the Alameda County Superior Court. In the instant action, Petitioner challenges the decision by the California Board of Parole Hearings (the "Board") denying Petitioner parole. Petitioner appeared before the Board on November 8, 2007.

On January 24, 2008, Petitioner filed a petition for writ of habeas corpus with the

1

1   Alameda County Superior Court challenging the Board's decision. *See* Resp't's Answer Exs. 1-

2   2, ECF No. 10. The Superior Court issued a reasoned opinion, dated January 30, 2008, denying

3   the petition. *See* Resp't's Answer Ex. 2. Petitioner sought relief in the California Court of

4   Appeal, First Appellate District, and the California Supreme Court; those petitions were likewise

5   denied, but without written opinions. *See* Resp't's Answer Exs. 3-6.

6        On August 11, 2008, Petitioner filed the instant federal petition for writ of habeas corpus.

7   Respondent filed an answer to the petition on June 24, 2009, to which Petitioner filed a traverse

8   on August 25, 2009.

### III.  FACTUAL BACKGROUND

> Early in the morning of June 20, 1992, three friends, Michael Enea,
> . . . Barton Damele . . . and Greg Spencer, . . . were walking along
> Grand Avenue in Oakland on their way home from a concert at the
> Scottish Rite Temple. According to Damele, when the three of
> them passed a Shell gas station, the[y] noticed a group of young
> African American men. One of the men at the Shell station
> appeared to be gesturing and yelling at Damele's group, who were
> Caucasian. Damele's group ignored the men and continued
> walking.
>
> As Damele's group crossed Ellita, . . . the group of African
> American men converged on them. Two of the men hit Damele.
> Damele covered his head and managed to run away from his
> attackers. Damele's attackers then ran up to Enea who had been
> hit and was lying on the ground.
>
> Damele ran to a nearby bar. From there he saw approximately five
> African American males surrounding Enea and kicking him while
> he lay unmoving on the ground. The men repeatedly kicked Enea
> and then ran off toward the gas station.
>
> As soon as they left, Damele went over to Enea, who was
> unconscious. Damele held his hand and said a prayer as they
> waited for the paramedics.
>
> Another witness to the events, Thomas Sanford . . . testified to the
> following: He was driving down Grand Avenue after leaving a
> bar, near the location of the incident. At the intersection of Grand
> Avenue and Ellita Street, a group of approximately five African
> American men ran across the street in front of him, causing him to
> have to break quickly. The men ran with their arms straight down
> at their side and their hands balled into fists. They were smiling
> and laughing. The five men converged on three white males who

were walking side by side.

Two of the five men attacked Damele, hitting him in the head. Damele covered his head with his hands, crouched and ran away. Two of the men also attacked Spencer, hitting him in the head as well.  Spencer also put his hands up in a defensive manner and ran away.  One attacker approached Enea from behind.  He ran up behind Enea and hit him with full force in the back of the head using a roundhouse punch.  Enea fell face forward, striking the ground, and did not move.  The man that punched him stood over him approximately five seconds and then kicked him hard on the side of the head.

After observing this part of the attack, Sanford made a U-turn to go back and attempt to help the victims.  After coming out of the turn, he saw the other four attackers who had stopped chasing Damele and Spencer, join the man standing over Enea.  The five men huddled around Enea and took turns kicking and punching him numerous times as he lay motionless.  Sanford exited his Jeep to defend Enea, taking his club locking device for his steering wheel as a weapon.  The attackers ran off to the Shell station, laughing. At least some of the attackers got into a black Maverick and drove away with the car lights off.

Sanford went to Enea and turned him over.  A pool of blood lay under his head and his eyes were bulging.  Sanford felt no heartbeat and no pulse.  He ran to a nearby phone and dialed 911. When he returned, Damele and Spencer were there.  Sanford tried to calm them and administered CPR and rescue breathing to Enea until the paramedics arrived.  Enea died later that night.  Dr. Sharon VanMeter [sic], . . . an expert in forensic pathology, testified that the cause of Enea's death was blunt trauma to the head and neck.  Van Meter identified approximately ten injuries to the head, consistent with hitting and kicking.  Enea suffered a massive hemorrhage over the base of the brain.  There was a tear in the vertebral artery, a major vessel which provides blood to the brain.  In addition, there were hemorrhages over the larynx, and fractures on both sides of the cartilage of the larynx.

Van Meter testified that if Enea was struck in the back of the head, by a tall man weighing 285 pounds, the blow could propel the body forward, which in turn would cause inordinate movement of the head, thereby causing blood vessels to tear.  One such blow would have been sufficient to cause death.

There was no bruising on the back of Enea's head, where Sanford saw Jones hit him.  However, Van Meter testified that a blow to the lower part of the head could cause the head to snap back, resulting in hyperextension and rupture of the artery.

Jones was arrested around one month after the attack.  Following

3

his arrest, Jones participated in two tape recorded interviews by the police, both of which were played for the jury. According to Jones' statement, he'd been drinking throughout the day and evening of Enea's murder and was "drunk" at the time in question.

Jones said that while he was at the concert at the Scottish Rite Temple on the night of the attack, a white man called him and his friends "a bunch of niggers." So Jones and his friends chased him. However, Jones fell and hurt his legs. His friends came back and said that nothing happened.

Jones and his friends left the concert in a light blue Rabbit and a black Maverick and went to a Shell gas station. At the gas station, Jones said in his statements, that he saw two of his friends Todd Jones and Michael Buchanan, run across the street toward a group of three white men who were walking down the street. He followed them and saw them start to fight. One of the men tried to hit his friend Todd, but missed. Jones ran up to that man and punched him hard in the jaw. The man fell to the ground and Jones went back across the street. Jones saw the other two white men run off. The next day, the hand he had used to hit the man with, was swollen.[1]

Petitioner was "raised by [his] mother, along with [his] three older half siblings from [his] mother's prior marriage." Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 27, Nov. 8, 2007. Petitioner also has another natural sibling. Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 27. He moved "back and forth between Seattle, Washington and the Oakland Bay area." Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 27. Petitioner, who is unmarried, "claims to have fathered a daughter in the mid 1980's with a Tiffany Booker from Seattle, Washington." Resp't's Answer Ex. 1, at 50-51; Parole Hr'g Tr. 28-29. He alleged that he communicates with his daughter, but in his 2007 psychological report, he reported that "his daughter used to write to him but this is no longer the case." Resp't's Answer Ex. 1, at 93; Parole Hr'g Tr. 71. When confronted with this discrepancy at the hearing, Petitioner explained that "she don't like to write. But we talk once a month." Resp't's Answer Ex. 1, at 93; Parole Hr'g Tr. 71. Nevertheless, Petitioner's family and

---

[1] The facts of the commitment offense are from the transcript of the Board's hearing on November 8, 2007. Resp't's Answer Ex. 1, at 36-42; Parole Hr'g Tr. 14-20, Nov. 8, 2007 (reading commitment offense from California Court of Appeal, First Appellate District, decision).

4

1  friends wrote letters in support of his release, including an offer of residence. Resp't's Answer
2  Ex. 1, at 82-86; Parole Hr'g Tr. 60-64.

3       Prior to incarceration, Petitioner "dropped out of high school" in the eleventh grade.
4  Resp't's Answer Ex. 1, at 49; Parole Hr'g Tr. 27. He "used marijuana and drank alcohol on
5  occasion." Resp't's Answer Ex. 1, at 50; Parole Hr'g Tr. 28. Typically, his "employment
6  consisted of construction work and dishwashing." Resp't's Answer Ex. 1, at 50; Parole Hr'g Tr.
7  28. At the time of the crime, he was employed at his uncle's nightclub. Resp't's Answer Ex. 1,
8  at 45; Parole Hr'g Tr. 23. Petitioner was 29 years old and considered himself "under the
9  influence" of alcohol when he committed the crime, but affirmed that he "remember[ed] what
10 happened." Resp't's Answer Ex. 1, at 42-43; Parole Hr'g Tr. 20-21.

11 IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

12      An application for writ of habeas corpus by a person in custody under judgment of a state
13 court can be granted only for violations of the Constitution or laws of the United States. 28
14 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*
15 *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).
16 This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,
17 the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521
18 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999). Under
19 AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in
20 state court proceedings unless the state court's adjudication of the claim:

21      (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
22      determined by the Supreme Court of the United States; or

23      (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
24      State court proceeding.

25 28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*
26 *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

1    In applying AEDPA's standards, the federal court must "identify the state court decision

2  that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

3  Where more than one state court has adjudicated a petitioner's claims, a federal habeas court

4  analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)

5  (finding presumption that later unexplained orders, upholding judgment or rejecting same claim,

6  rests upon same ground as prior order)).  Thus, a federal habeas court looks through ambiguous

7  or unexplained state court decisions to the last reasoned decision to determine whether that

8  decision was contrary to or an unreasonable application of clearly established federal law. *Bailey*

9  *v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003).  "The question under AEDPA is not whether a

10  federal court believes the state court's determination was incorrect but whether that

11  determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550

12  U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

13                                    V.  CLAIMS FOR REVIEW

14    The petition for writ of habeas corpus sets forth four requests and one ground for relief.

15  Petitioner requests:  (1) an order to show cause; (2) appointment of counsel; (3) discovery; and

16  (4) an evidentiary hearing.  Pet'r's Pet., pt. 1, at 22, ECF No. 1.  Petitioner also claims that the

17  Board's parole denial violated his due process rights and seeks habeas, declaratory, and

18  injunctive relief. *Id.*

19         A.  First Request:  Order To Show Cause

20    First, in his prayer for relief, Petitioner requests that this Court "[i]ssue an Order To Show

21  Cause on an expedited basis" under Rule 4.551 of the California Rules of Court. *Id.*  As stated

22  earlier, Respondent filed an answer to the petition on June 24, 2009, to which Petitioner filed a

23  traverse on August 25, 2009.  Accordingly, the Court denies Petitioner's request for an order to

24  show cause as moot.

25         B.  Second Request:  Appoint Counsel

26    Second, Petitioner requests appointment of counsel in further litigation of this action. *Id.*

1    The Sixth Amendment right to counsel does not apply in habeas corpus actions. *See Knaubert v.*
2    *Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986). A district court, however, may appoint counsel to
3    represent a habeas petitioner whenever "the court determines that the interests of justice so
4    require," and such person is financially unable to obtain representation. 18 U.S.C. §
5    3006A(a)(2)(B). The decision to appoint counsel is within the district court's discretion. *See*
6    *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986). The courts have made appointment of
7    counsel the exception rather than the rule by limiting it to: (1) capital cases; (2) cases that turn
8    on substantial and complex procedural, legal, or mixed legal and factual questions; (3) cases
9    involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require
10   the assistance of experts either in framing or in trying the claims; (5) cases in which the petitioner
11   is in no position to investigate crucial facts; and (6) factually complex cases. *See generally* 1 J.
12   LIEBMAN & R. HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 12.3b, at 383-86
13   (2d ed. 1994). Appointment is mandatory only when the circumstances of a particular case
14   indicate that appointed counsel is necessary to prevent due process violations. *See Chaney*, 801
15   F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965).

16         The Court finds that appointment of counsel is not warranted in this case. Petitioner's
17   claims are typical claims that arise in habeas petitions and are not especially complex. This is
18   not an exceptional case that would warrant representation on federal habeas review. The Court,
19   therefore, denies Petitioner's request for appointment of counsel.

20         C.  Third Request: Discovery

21         Third, Petitioner requests the Court to initiate discovery. Pet'r's Pet., pt. 1, at 22. "The
22   writ of habeas corpus is not a proceeding in the original criminal prosecution but an independent
23   civil suit." *Riddle v. Dyche*, 262 U.S. 333, 335-36 (1923); *see, e.g., Keeney v. Tamayo-Reyes*,
24   504 U.S. 1, 14 (1992) (O'Connor, J., dissenting). However, modern habeas corpus procedure has
25   the same function as an ordinary appeal. *O'Neal v. McAnnich*, 513 U.S. 432, 442 (1995)
26   (recognizing federal court's function in habeas corpus proceedings is to "review errors in state

1 criminal trials" (emphasis omitted)).  A habeas proceeding does not proceed to "trial," and unlike

2 other civil litigation, parties in a habeas proceeding are not entitled to discovery as a matter of

3 course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Harris v. Nelson*, 394 U.S. 286, 295

4 (1969).  Although discovery is available pursuant to Rule 6 of the Federal Rules Governing

5 Section 2254 Cases, it is only granted at the court's discretion, and upon a showing of good

6 cause. *Bracy*, 520 U.S. at 904; *McDaniel v. U.S. District Court (Jones)*, 127 F.3d 886, 888 (9th

7 Cir. 1997); *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997); *see also* Rule 6(a), Federal

8 Rules Governing Section 2254 Cases.

9 Good cause is shown "where specific allegations before the court show reason to believe

10 that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

11 entitled to relief." *Bracy*, 520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. at 300); *see*

12 *also Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2004).  A request for discovery "must also

13 include any proposed interrogatories and requests for admission, and must specify any requested

14 documents." Rule 6(b), Federal Rules Governing Section 2254 Cases.  Federal courts have "the

15 power to 'fashion appropriate modes of procedure,' including discovery, to dispose of habeas

16 petitions 'as law and justice require[.]'" *Bracy*, 520 U.S. at 904 (citations omitted) (quoting

17 *Harris*, 394 U.S. at 299-300); *see also Bittaker*, 331 F.3d at 728.

18 Here, Petitioner does not demonstrate good cause as to why his request for discovery

19 should be granted.  Petitioner does not state why discovery is necessary, or why discovery is

20 relevant to a determination of the petition's merits.  Petitioner also does not include any proposed

21 interrogatories or requests for admission, and fails to specify any requested documents, as

22 required under Rule 6(b). *See* Rule 6(b), Federal Rules Governing Section 2254 Cases.  The

23 Court, therefore, utilizes its discretion in finding Petitioner has failed to establish good cause and

24 denies Petitioner's request for discovery.

25 D. Fourth Request:  Evidentiary Hearing

26 Fourth, Petitioner requests an evidentiary hearing.  Pet'r's Pet., pt. 1, at 22.  Under 28

1    determine whether a factual basis exists in the record to support a petitioner's claims and, if not,

2    whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078

3    (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005); *Insyxiengmay v.*

4    *Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005). "[W]here the petitioner establishes a colorable

5    claim for relief and has never been afforded a state or federal hearing on this claim, we must

6    remand to the district court for an evidentiary hearing." *Earp*, 431 F.3d at 1167 (citing

7    *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004);

8    *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001)). In other words, a hearing is required if:

9    "(1) [the defendant] has alleged facts that, if proven, would entitle him to habeas relief, and (2)

10   he did not receive a full and fair opportunity to develop those facts[.]" *Williams v. Woodford*,

11   384 F.3d 567, 586 (9th Cir. 2004).

12           Here, Petitioner's request does not establish that these requirements are satisfied such that

13   an evidentiary hearing would be appropriate. As explained later, Petitioner does not allege facts

14   that establish a colorable claim for relief because the Board's parole denial is supported by "some

15   evidence" demonstrating future dangerousness, and the Superior Court's decision is reasonable.

16   *See infra* Part V.E. Accordingly, the Court denies Petitioner's request for an evidentiary hearing.

17           Thus, this matter is now ready for decision. For the following reasons, the Court

18   recommends that habeas, declaratory, and injunctive relief be denied.

19           E.  Due Process Claim

20           Petitioner claims that the Board's parole denial violated his due process rights because

21   "[t]here is no evidence under the 'some evidence' test that Petitioner is a current or unreasonable

22   risk or threat to society." Pet'r's Pet., pt. 1, at 22. Specifically, Petitioner alleges that: (1) his

23   "role in the offense was not exceptional," *id.* at 7; (2) he has already been punished for his 115

24   violations, *id.* at 15; (3) his non-violent priors and prior alcohol addiction are not unsuitability

25   factors, *id.* at 16; (4) the Board improperly relied on the Deputy District Attorney's opposition to

26   grant parole, *id.*; (5) Petitioner's "excellent relationships" with family, friends, work supervisors,

1  grant parole, *id.*; (5) Petitioner's "excellent relationships" with family, friends, work supervisors,

2  and custodial staff belie the Board's finding of his "unstable social history," *id.* at 17; (6) his

3  psychological report was in fact "favorable," *id.* at 17-18; and (7) he has realistic plans upon

4  release, contrary to the Board's determination. *Id.* at 18. For the following reasons, Petitioner's

5  allegations lack merit.

6              1. Legal Standard for Parole Denial

7        The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

8  a person of life, liberty, or property without due process of law. A person alleging a due process

9  violation must first demonstrate that he or she was deprived of a protected liberty or property

10  interest, and then show that the procedures attendant upon the deprivation were not

11  constitutionally sufficient. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);

12  *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

13        A protected liberty interest may arise from either the Due Process Clause itself or from

14  state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution

15  does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole

16  date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). The full panoply of rights afforded a

17  defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

18  proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme

19  Court has held that a parole board's procedures are constitutionally adequate if the inmate is

20  given an opportunity to be heard and a decision informing him of the reasons he did not qualify

21  for parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979). If a

22  state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

23  parole release will be granted' when or unless certain designated findings are made," thereby

24  giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*,

25  442 U.S. at 12).

26        In California, Penal Code Section 3041 sets forth the state's legislative standards for

1   determining parole for life-sentenced prisoners.  Subsection (a) provides that "[o]ne year prior to

2   the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate

3   and shall normally set a parole release date . . . ."  Subsection (b) provides an exception to the

4   regular and early setting of a life-sentenced individual's term, if the Board determines "that the

5   gravity of the current convicted offense or offenses, or the timing and gravity of current or past

6   convicted offense or offenses, is such that consideration of the public safety requires a more

7   lengthy period of incarceration . . . ."  Based on this statute, California state prisoners who have

8   been sentenced to prison with the possibility of parole have a clearly established, constitutionally

9   protected liberty interest in receipt of a parole release date.  *Allen*, 482 U.S. at 377-78 (quoting

10  *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v.*

11  *Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910,

12  914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

13         Additionally, as a matter of California state law, denial of parole to state inmates must be

14  supported by at least "some evidence" demonstrating future dangerousness.  *Hayward v.*

15  *Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th

16  1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr.

17  3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d

18  174 (2002)).  California's "some evidence" requirement is a component of the liberty interest

19  created by the state's parole system.  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The

20  federal Due Process Clause requires, in turn, that California comply with its own "some

21  evidence" requirement.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).

22  Thus, a reviewing court such as this one must "decide whether the California judicial decision

23  approving the . . . decision rejecting parole was an 'unreasonable application' of the California

24  'some evidence' requirement, or was 'based on an unreasonable determination of the facts in

25  light of the evidence.'"  *Hayward*, 603 F.3d at 562-63.

26         The analysis of whether some evidence supports the denial of parole to a California state

1  inmate is framed by the state's statutes and regulations governing parole suitability

2  determinations. *See Irons*, 505 F.3d at 851. A reviewing court "must look to California law to

3  determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then

4  must review the record to determine whether the state court decision holding that these findings

5  were supported by 'some evidence' [] constituted an unreasonable application of the 'some

6  evidence' principle." *Id.*

7  　　　　Title 15, Section 2402 of the California Code of Regulations sets forth various factors to

8  be considered by the Board in its parole suitability findings for murderers. The Board is directed

9  to consider all relevant, reliable information available regarding

10  　　　　　the circumstances of the prisoner's social history; past and present
   　　　　　mental state; past criminal history, including involvement in other
11  　　　　　criminal misconduct which is reliably documented; the base and
   　　　　　other commitment offenses, including behavior before, during and
12  　　　　　after the crime; past and present attitude toward the crime; any
   　　　　　conditions of treatment or control, including the use of special
13  　　　　　conditions under which the prisoner may safely be released to the
   　　　　　community; and any other information which bears on the
14  　　　　　prisoner's suitability for release.

15  CAL. CODE REGS. tit. 15, § 2402(b). The regulation also lists specific circumstances which tend

16  to show suitability or unsuitability for parole. *Id.* § 2402(c)-(d).

17  　　　　Under the applicable state regulations, factors relating to a commitment offense tend to

18  show unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the

19  offense was carried out in a dispassionate and calculated manner, such as an execution-style

20  murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a

21  manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the

22  motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2402(c)(1)(A)-

23  (E).

24  　　　　Section 2402(d) sets forth the circumstances tending to show suitability which include:

25  　　　　　(1) No Juvenile Record. The prisoner does not have a record of
   　　　　　assaulting others as a juvenile or committing crimes with a
26  　　　　　potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d)(1)-(9).

The overriding concern is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535 .  Thus, the proper articulation of the standard of review is not whether some evidence supports the stated reasons for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

2.  State Court Decision

1        Here, because the California Supreme Court and California Court of Appeal summarily

2  denied the petition, the state court decision appropriate for review is the Superior Court's

3  decision. In applying AEDPA's standards, this Court finds the Superior Court properly held that

4  "[t]he record presented to this Court for review demonstrates that there was certainly some

5  evidence" to support the Board's parole denial. *See* Resp't's Answer Ex. 2, at 2. The Superior

6  Court found the Board articulated negative factors, in addition to those related to the

7  commitment offense, which weighed in favor of denying parole. The Superior Court considered

8  Petitioner's (1) commitment offense; (2) unstable social history, escalating pattern of criminal

9  conduct, and failure to benefit from society's previous attempts to rehabilitate him; (3) limited

10  participation in self-help programs; (4) disciplinary record while incarcerated; (5) unfavorable

11  psychological report and lack of insight into the commitment offense; and (6) inadequate parole

12  plans. *Id.*

13                      a. Commitment Offense

14        First, the Superior Court properly noted that the Board considered Petitioner's

15  "committing offense," among other factors, when denying parole. *Id.* The Board read into the

16  record the summary of Petitioner's commitment offense, taken from a decision by the California

17  Court of Appeal, First Appellate District. *See supra* Part III. At the hearing and in summary, the

18  Board explained its reliance, in part, on Petitioner's offense as follows:

19             This offense was carried out in an especially cruel and callous

20             manner. And I'm going to incorporate by reference the entire
               appellate commitment offense description.

21             There were multiple victims who were attacked, injured in the
               same incident. This offense was carried out dispassionately and in

22             a calculated manner. . . . [T]he main victim was Michael Enea. He
               was abused and he was mutilated during this offense. Crossing the

23             street, four men attacked the victim and his friends with fists. The
               victim's friends were punched but ran away. The inmate hit the

24             victim so hard he collapsed on the sidewalk.

25             And, in fact, the Panel did review the photographs we have of the
               victim and have noted that the victim's skull was literally cracked

26             by the blow that he received.

1
2

> The co-parts then repeatedly kicked the victim in the head and the upper body before returning to the gas station laughing and fleeing in their cars, the entire incident lasting less than two minutes. . . .

3
4
5

> It was a terrible way to die. . . . This victim lay in a pool of blood, his eyes bulging. Sanford, the man who attempted to rescue him, was unable to perform CPR, dialed 911, but to no avail. This man died of approximately ten head injuries according to the forensic pathologist and his head was literally split open.

6
7
8
9

> This offense was carried out in a manner demonstrating callous disregard for human suffering. And this inmate had clear opportunities to cease but he continued and he delivered extremely lethal blows. These blows were consistent with hitting and kicking. Massive hemorrhage over the base of the brain, tear in the vertebral artery, hemorrhages over the larynx and fractures on both sides of the cartilage of the larynx.

10
11

> The motive for this crime was very trivial in relation to the offense. It was prey attack. And it was prey mentality.

12

> Sir, this panel finds that you lack insight into and understanding of the nature and magnitude of this commitment offense.

13    Resp't's Answer Ex. 1, at 106-07, 109-10; Parole Hr'g Tr. 84-85, 87-88.

14          At the hearing, Petitioner chose to discuss "all peripheral issues relating to suitability" but

15    not to discuss his life crime. Resp't's Answer Ex. 1, at 35; Parole Hr'g Tr. 13. The Board

16    acknowledged that Petitioner is "not required to admit [his] offense or discuss [his] offense,"

17    Resp't's Answer Ex. 1, at 34; Parole Hr'g Tr. 12, and posed "some questions" that Petitioner

18    "may elect to answer." Resp't's Answer Ex. 1, at 42; Parole Hr'g Tr. 20. From these questions,

19    Petitioner acknowledged he was drinking on the night of the crime but was able to recall what

20    happened. Resp't's Answer Ex. 1, at 42; Parole Hr'g Tr. 20. Petitioner did not think the victim

21    had been killed, and did not attempt to obtain help because Petitioner "didn't think he was hurt as

22    bad as he was." Resp't's Answer Ex. 1, at 43; Parole Hr'g Tr. 21. He confirmed that he felt

23    responsible and scared, but carried on for a month before his arrest because "I just needs to do

24    what I'm doing." Resp't's Answer Ex. 1, at 44-45; Parole Hr'g Tr. 22-23. Thus, the Superior

25    Court properly found that the Board weighed the nature and gravity of Petitioner's commitment

26    offense.

1              b.  Unstable Social History, Escalating Pattern of Criminal Conduct, and

2                   Failure to Benefit from Society's Previous Attempts at Rehabilitation

3         Second, the Superior Court appropriately noted that the Board examined Petitioner's

4  "unstable social history."  Resp't's Answer Ex. 1, at 107; Parole Hr'g Tr. 85; *see* Resp't's

5  Answer Ex. 2, at 2.  The Board stated Petitioner:

6              has prior criminality that shows an escalating pattern of criminal
               conduct.  He has failed society's previous attempts to correct his
7              criminality with juvenile probation, adult probation.  Was a ward
               of the court as a juvenile.  And he was involved in a number of
8              crimes that have been read into the record.

9  Resp't's Answer Ex. 1, at 107; Parole Hr'g Tr. 85; *see* Resp't's Answer Ex. 2, at 2.

10        The Board reviewed Petitioner's juvenile record, where the Probation Officer's Report

11  indicated that he was "made a Ward of the Court in 1980 . . . [a]s a result of Fraudulent Credit

12  Card Use, Receiving Stolen Property and Petty Theft charges."  Resp't's Answer Ex. 1, at 47;

13  Parole Hr'g Tr. 25.  When the Board asked him to explain these charges, Petitioner replied, "A

14  friend had a credit card that we'd go to the mall with.  When we went to the mall, he bought

15  some clothes.  That was it."  Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25.  That matter was

16  dismissed on May 27, 1981, after his "performance on juvenile probation was satisfactory."

17  Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25.

18        Then, the Board went through Petitioner's "laundry list" of Petitioner's arrests.  Resp't's

19  Answer Ex. 1, at 46; Parole Hr'g Tr. 24.  In 1981, the San Leandro Police Department arrested

20  Petitioner for petty theft, which had no disposition.  Resp't's Answer Ex. 1, at 47; Parole Hr'g

21  Tr. 25.  The Board also stated that the San Leandro Police Department arrested Petitioner for

22  "Assault to Rape, detain only."  Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25.  In 1984, the

23  Seattle Police Department arrested Petitioner for obstructing a police officer, which had no

24  disposition as well.  Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25.  In 1985, the Seattle Police

25  Department arrested Petitioner for robbery, where he was released.  Resp't's Answer Ex. 1, at 47;

26  Parole Hr'g Tr. 25.  Also in 1985, the Seattle Police Department arrested him for attempt to

1    evade police, which had no disposition. Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25. In

2    that same year, the Oakland Police Department arrested Petitioner as a fugitive from justice in

3    Washington for an "Assault to Rape." Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25. On that

4    arrest, Petitioner was "released" for "lack of probable cause." Resp't's Answer Ex. 1, at 47;

5    Parole Hr'g Tr. 25. Petitioner was then extradited to Washington, but "we don't have an

6    outcome on that." Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25. In 1989, Petitioner was

7    arrested for "Transport or Sales, Controlled Substance, no disposition." Resp't's Answer Ex. 1,

8    at 47; Parole Hr'g Tr. 25. He was placed into Placer County Jail in Auburn and released.

9    Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25. In 1991, the Seattle Police Department

10   arrested him for possession of dangerous drugs, with no disposition. Resp't's Answer Ex. 1, at

11   47; Parole Hr'g Tr. 25.

12        In 1986, Petitioner had one felony conviction for one count of attempted burglary, CAL.

13   PENAL CODE § 459, in Oakland. Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25. He was

14   sentenced to three years probation. Resp't's Answer Ex. 1, at 47; Parole Hr'g Tr. 25. When

15   asked to explain this conviction at the hearing, Petitioner stated he was "caught up in the wrong

16   spot at the wrong time." Resp't's Answer Ex. 1, at 48; Parole Hr'g Tr. 26. Petitioner alleged he

17   "was coming from a club and some friends . . . was hitting a trailer. . . . As soon as they grabbed

18   the trailer, the police came out." Resp't's Answer Ex. 1, at 48; Parole Hr'g Tr. 26. At the

19   hearing, Petitioner claimed he only "pleaded no contest because [he] didn't want to fight the trial

20   for a year because [he] was under extradition." Resp't's Answer Ex. 1, at 48; Parole Hr'g Tr. 26.

21   The Superior Court, therefore, appropriately found that the Board reviewed Petitioner's unstable

22   social history, escalating pattern of criminal conduct, and failure to embrace previous attempts at

23   rehabilitation.

24                          c. Inadequate Participation in Self-Help Programs

25        Third, the Superior Court recognized that the Board examined Petitioner's inadequate

26   participation in self-help programs. *See* Resp't's Answer Ex. 2, at 2. For one, Petitioner had

1   limited education or vocational training.  In 1993, Petitioner received a GED while incarcerated.

2   Resp't's Answer Ex. 1, at 30-31; Parole Hr'g Tr. 8-9.  In 1996, the Commissioner stated that

3   Petitioner had to take the Test of Adult Basic Education (TABE), even though Petitioner

4   "explained to him that [he] had a GED. . . . But [he] still needed to take the test."  Resp't's

5   Answer Ex. 1, at 63; Parole Hr'g Tr. 41.  So, Petitioner "never opened the book . . . and didn't

6   take it seriously."  Resp't's Answer Ex. 1, at 63; Parole Hr'g Tr. 41.  Petitioner's "reading

7   showed a 4.4," which caused "concerns."  Resp't's Answer Ex. 1, at 63; Parole Hr'g Tr. 41.  In

8   April 2003, Petitioner refused to take the TABE again.  Resp't's Answer Ex. 1, at 63; Parole

9   Hr'g Tr. 41.  The Board commented, "You know, that kind of behavior doesn't help you."

10  Resp't's Answer Ex. 1, at 63; Parole Hr'g Tr. 41.

11         The Board also reviewed a counselor's report, which provided that from November 10,

12  2001 to November 9, 2004, Petitioner had "no vocational training, no academics."  Resp't's

13  Answer Ex. 1, at 53-54; Parole Hr'g Tr. 31-32.  From November 10, 2004 to November 9, 2005,

14  Petitioner also had no vocational training, but did complete nine phases of the FEMA program.

15  Resp't's Answer Ex. 1, at 55; Parole Hr'g Tr. 33.  Petitioner then alleged that between "either

16  early '05 or late '04" and the time of the hearing, he completed 24 units at Coastline Community

17  College, but failed to provide a transcript.  Resp't's Answer Ex. 1, at 56-57; Parole Hr'g Tr. 34-

18  35.  At the time of the hearing, however, Petitioner was not taking any courses.  Resp't's Answer

19  Ex. 1, at 56-57; Parole Hr'g Tr. 34-35.  When rendering its decision, the Board mentioned that

20  "[t]his inmate has no vocational certifications yet."  Resp't's Answer Ex. 1, at 108; Parole Hr'g

21  Tr. 86.

22         Petitioner's employment during incarceration fared better than his education.  From

23  November 10, 2001 to March 12, 2003, he worked in the dental laboratory making dentures, with

24  average to above average work reports.  Resp't's Answer Ex. 1, at 53-54; Parole Hr'g Tr. 31-32.

25  From November 10, 2003 to November 2005, Petitioner worked as a porter and received average

26  to exceptional work reports.  Resp't's Answer Ex. 1, at 54-55; Parole Hr'g Tr. 32-33.  On

1  November 4, 2005, Petitioner was assigned to the kitchen, and for the period between November

2  10, 2005 to November 9, 2006, he received average and above average work reports. Resp't's

3  Answer Ex. 1, at 55; Parole Hr'g Tr. 33. At the time of the hearing, Petitioner stated he was

4  "still in the kitchen" as an "A.M. cook." Resp't's Answer Ex. 1, at 56; Parole Hr'g Tr. 34.

5         The Board also reviewed Petitioner's limited self-help programming, and advised

6  Petitioner to address his substance abuse problem and to read self-help literature. In 1998,

7  Petitioner completed "20 hours of the literary organization life skills." Resp't's Answer Ex. 1, at

8  64; Parole Hr'g Tr. 42. Petitioner participated in Alcoholics Anonymous (AA) "for

9  approximately six quarters between 2001 and 2003." Resp't's Answer Ex. 1, at 71, 76, 108;

10  Parole Hr'g Tr. 49, 54, 86. In March 2003, Petitioner also attended a "pastoral care services

11  program . . . . There was no psychiatric treatment." Resp't's Answer Ex. 1, at 54; Parole Hr'g Tr.

12  32. Petitioner received certificates for the (1) Stress Management Program, dated March 27,

13  2004; (2) Phases Life Skill Program, dated June 20, 2005; and (3) Anger Management Program,

14  dated September 7, 2005. Resp't's Answer Ex. 1, at 54; Parole Hr'g Tr. 32. In September 2006,

15  Petitioner participated in the "40 Days of Purpose spiritual growth program." Resp't's Answer

16  Ex. 1, at 64; Parole Hr'g Tr. 42.

17         When asked if Petitioner were participating in any self-help programs at the time of the

18  hearing, Petitioner replied, "I go to AA every now and then. It depends if I'm tired or not."

19  Resp't's Answer Ex. 1, at 58; Parole Hr'g Tr. 36. The Board told Petitioner that "the doctor

20  asked [him] to go back". Resp't's Answer Ex. 1, at 58; Parole Hr'g Tr. 36; *see* Resp't's Answer

21  Ex. 1, at 80; Parole Hr'g Tr. 58 ("[As for] the need for further therapy programs while

22  incarcerated, the doctor writes ongoing education. . . . [S]elf-help groups focused on substance

23  abuse prevention might be helpful. Bibliotherapy might be a useful adjunct, especially if the

24  available literature is consistent with his Muslim beliefs."). Petitioner repeated, "I just go every

25  now and again." Resp't's Answer Ex. 1, at 58; Parole Hr'g Tr. 36. Petitioner also stated that

26  there used to be "Anger Management and things . . . in the building, but they haven't done it in a

1  while. . . . Other than that, no, I just sit back and read. . . . Last book I read was Never Going

2  Home. It was more or less a entertainment [sic] than anything." Resp't's Answer Ex. 1, at 59;

3  Parole Hr'g Tr. 37. The Board then suggested that Petitioner "might want to concentrate [his]

4  readings in the area of self-help, things that might help you get a better understanding of yourself

5  and how it applies to your upbringing, how you grew up, and when it went right up to the murder

6  and where you are today." Resp't's Answer Ex. 1, at 60; Parole Hr'g Tr. 38.

7       Additionally, the Board noted that "substance abuse is a major issue with" Petitioner.

8  Resp't's Answer Ex. 1, at 64; Parole Hr'g Tr. 42. When the Board asked if Petitioner studied or

9  knew the Twelve Steps, Petitioner stated, "I can't recall none right now. But no. I'm gonna say

10 no." Resp't's Answer Ex. 1, at 64; Parole Hr'g Tr. 42. Accordingly, the Board recommended

11 that Petitioner "address that on a regular basis" with some type of program because "[e]ven when

12 you get out of prison, . . . we're gonna want to see . . . what you're going to do regarding

13 substance abuse." Resp't's Answer Ex. 1, at 64-65; Parole Hr'g Tr. 42-43. Thus, the Superior

14 Court appropriately held that the Board weighed Petitioner's insufficient participation in self-

15 help programs in his parole denial.

16                    d. Disciplinary Record While Incarcerated

17      Fourth, the Superior Court properly found that the Board considered Petitioner's

18 disciplinary record while incarcerated. *See* Resp't's Answer Ex. 2, at 2. The Board found two

19 115 violations, one on August 6, 1999 for battery on a police officer, and another on November

20 27, 1997 for disobeying a direct order. Resp't's Answer Ex. 1, at 65; Parole Hr'g Tr. 43.

21 Petitioner also accumulated ten 128 violations. Resp't's Answer Ex. 1, at 65; Parole Hr'g Tr. 43.

22 Four of those ten 128 violations were within the last five years of Petitioner's November 8, 2007

23 hearing: (1) on January 12, 2006, Petitioner received one for disobeying orders; (2) on August

24 22, 2005, Petitioner received another for disobeying orders; (3) on June 27, 2003, Petitioner had

25 a "grooming violation;" and (4) on April 9, 2003, Petitioner failed to show on a docket. Resp't's

26 Answer Ex. 1, at 65; Parole Hr'g Tr. 43.

1        For the January 12, 2006 violation, the Board stated that as Petitioner was approaching a

2    hot water found, an officer told Petitioner that the "water fountain was out of bounds.  And

3    announcements were made twice on the Public Address system."  Resp't's Answer Ex. 1, at 67;

4    Parole Hr'g Tr. 45.  Petitioner was "ordered to stay away."  Nonetheless, Petitioner looked up,

5    said "'I heard you,'" and "proceeded to fill [his] cup with water."  Resp't's Answer Ex. 1, at 67;

6    Parole Hr'g Tr. 45.  When confronted with this recount at the hearing, Petitioner replied that the

7    particular officer was "always writin' people for something that don't ever stick."  Resp't's

8    Answer Ex. 1, at 67; Parole Hr'g Tr. 45.  For the August 25, 2005 violation, the Board told

9    Petitioner that he received a direct order by another officer to remove clothes from around his

10    bunk.  Resp't's Answer Ex. 1, at 67; Parole Hr'g Tr. 45.  Petitioner, however, "refused to remove

11    [his] clothing from around [his] bunk."  Resp't's Answer Ex. 1, at 67; Parole Hr'g Tr. 45.  At the

12    hearing, Petitioner answered, "Everybody in the whole dorm has clothes around their bunk.  So

13    why just pick on me? . . . I removed it."  Resp't's Answer Ex. 1, at 67; Parole Hr'g Tr. 45.

14        The Board responded that "these are behavior issues that we're concerned about."

15    Resp't's Answer Ex. 1, at 68; Parole Hr'g Tr. 46.  The Board expressed concern over whether

16    Petitioner could "reintegrate into society" and "be able to cooperate with the parole officer."

17    Resp't's Answer Ex. 1, at 68; Parole Hr'g Tr. 46.  When relaying its decision, the Board noted

18    that Petitioner's 115 violations "do include violence," and considered Petitioner's ten 128

19    violations "in aggregate."  Resp't's Answer Ex. 1, at 108; Parole Hr'g Tr. 86.  The Superior

20    Court, therefore, properly found that the Board weighed Petitioner's disciplinary record while

21    incarcerated against Petitioner.

22             e. Unfavorable Psychological Report and Lack of Insight Into the

23                   Commitment Offense

24        Fifth, the Superior Court appropriately maintained that the Board factored in Petitioner's

25    unfavorable psychological report and lack of insight into the commitment offense.  *See* Resp't's

26    Answer Ex. 2, at 2.  Overall, the psychological evaluation assessed that Petitioner's "risk for

future violence in the community is in the moderate high range." Resp't's Answer Ex. 1, at 78;

Parole Hr'g Tr. 56.  The evaluation reported that Petitioner had an "antisocial personality

disorder" and an "alcoholic dependence in sustained full remission in a controlled environment."

Resp't's Answer Ex. 1, at 74; Parole Hr'g Tr. 52.  According to the report, however, Petitioner

recognized no need for ongoing substance abuse treatment and had no plans for relapse

prevention.  Resp't's Answer Ex. 1, at 77; Parole Hr'g Tr. 55.  If paroled, Petitioner would likely

"be exposed to the same destabilizers (alcohol, old friends, lack of structure)" when Petitioner

committed the crime.  Resp't's Answer Ex. 1, at 77; Parole Hr'g Tr. 55.

Importantly, the psychological evaluation detailed that Petitioner's "antisocial behaviors

have been marked by impulsivity and a lack of remorse."  Resp't's Answer Ex. 1, at 75; Parole

Hr'g Tr. 53.  Petitioner "denied having a problem with alcohol abuse, but the evidence suggests

otherwise."  Resp't's Answer Ex. 1, at 75; Parole Hr'g Tr. 53.  The report raised concerns over

Petitioner's "lack of insight" into his anger, "his substance abuse[,] and negative attitude toward

treatment."  Resp't's Answer Ex. 1, at 77-78; Parole Hr'g Tr. 55-56.  The evaluation also noted

Petitioner failed to "accept responsibility for Mr. Enrea's [sic] murder and the role that his (Mr.

Jones') own racist beliefs played in this murder," which "remain significant but unexplored . . . ."

Resp't's Answer Ex. 1, at 78; Parole Hr'g Tr. 56.  Rather, Petitioner contended that he ran over

to help his nephew, who "got into a verbal altercation with someone in Mr. Enea's party. . . . He

denied that he kicked the victim."  Resp't's Answer Ex. 1, at 73; Parole Hr'g Tr. 51.  The

psychological evaluation recommended "[s]elf-help groups for substance abuse and anger

management."  Resp't's Answer Ex. 1, at 78; Parole Hr'g Tr. 56.

As the Board noted, Petitioner told the psychological evaluator that he was "not a

criminal."  Resp't's Answer Ex. 1, at 110; Parole Hr'g Tr. 88.  When the Board asked Petitioner

at the hearing if he were a criminal, Petitioner said no.  Resp't's Answer Ex. 1, at 110; Parole

Hr'g Tr. 88.  Then, when asked what Petitioner defined as a criminal, Petitioner responded,

"[S]omeone who commits crimes."  Resp't's Answer Ex. 1, at 110; Parole Hr'g Tr. 88.

1  Petitioner also "admitted to committing the crime." Resp't's Answer Ex. 1, at 110; Parole Hr'g

2  Tr. 88. When pointed out to Petitioner that "there was a conflict in these remarks," Petitioner

3  said, "I don't know." Resp't's Answer Ex. 1, at 110; Parole Hr'g Tr. 88. The Board, therefore,

4  concluded that Petitioner needed "to develop insight into this crime" and that the "psychological

5  report dated February 7, 2007 by Dr. (sp) Jatinger Singh[] does not support parole," which the

6  Superior Court properly acknowledged. Resp't's Answer Ex. 1, at 108, 111; Parole Hr'g Tr. 86,

7  89; *see* Resp't's Answer Ex. 2, at 2.

8                                    f. Inadequate Parole Plans

9        Finally, the Superior Court properly affirmed the Board's determination that Petitioner

10  had inadequate parole plans. *See* Resp't's Answer Ex. 2, at 2. At the hearing, the Board

11  informed Petitioner that he had "no completion of a formal vocational program." Resp't's

12  Answer Ex. 1, at 61; Parole Hr'g Tr. 39. Petitioner explained he was "trying to find a school that

13  offers a course" in dental work. Resp't's Answer Ex. 1, at 62; Parole Hr'g Tr. 40. "But so far,

14  no luck." Resp't's Answer Ex. 1, at 62; Parole Hr'g Tr. 40. Petitioner also alleged that he "had

15  two job offers in Seattle, but those letters did not make it . . . ." Resp't's Answer Ex. 1, at 86;

16  Parole Hr'g Tr. 64. The Board, however, only "ha[d] the power to parole [Petitioner] to the state

17  of California," so "we'd be looking for your employment plans in California." Resp't's Answer

18  Ex. 1, at 86; Parole Hr'g Tr. 64. Petitioner thereby admitted that he has "no employment offers

19  in California." Resp't's Answer Ex. 1, at 86; Parole Hr'g Tr. 64. Accordingly, the Board

20  decided that "the dependence upon one residential plan with a family friend, Elnetra Williams, in

21  Manteca, is not sufficient for the transition this inmate needs to make from the prison setting to

22  society." Resp't's Answer Ex. 1, at 108; Parole Hr'g Tr. 86. The Board thus factored in

23  Petitioner's lack of "acceptable employment plans" and "questionable marketable skills" in

24  denying Petitioner parole, and the Superior Court properly affirmed this. Resp't's Answer Ex. 1,

25  at 86-87; Parole Hr'g Tr. 64-65; *see* Resp't's Answer Ex. 2, at 2.

26        In sum, the Superior Court reasonably concluded that "there was no abuse of discretion

23

1  by the Board" because "there was certainly some evidence, including, but not limited to the

2  committing offense, Petitioner's unstable history, Petitioner's escalating pattern of criminal

3  conduct, Petitioner's failure to benefit form [sic] society's previous attempts to rehabilitate

4  [P]etitioner, [P]etitioner's limited participation in self help programs and [P]etitioner's lack of

5  insight into the committing offense, [P]etitioner's disciplinary record while incarcerated, the

6  unfavorable psychological report submitted in [P]etitioner's matter, and [P]etitioner's inadequate

7  parole plans." *See* Resp't's Answer Ex. 2, at 2.  These factors demonstrate a nexus between the

8  facts in the record regarding Petitioner's commitment offense, which the Board may accept as

9  proven and true, and the ultimate conclusion that Petitioner still posed a risk of danger or threat

10 to the public.  These factors also independently demonstrate some evidence in the record that

11 Petitioner was not suitable for parole.  The Superior Court, therefore, properly concluded that the

12 Board's decision withstands the minimally stringent "some evidence" test and has not violated

13 Petitioner's right to due process of law.

14        F.  Declaratory and Injunctive Relief

15        In Petitioner's prayer for relief, Petitioner requests that the Court:  (1) "Issue an Order for

16 Declatory [sic] Relief;" (2) "Issue an Order for Injunctive Relief;" (3) "Declare the rights of the

17 parties;" and (4) "Order Petitioner discharged, or in the alternative, order Petitioner released for

18 parole, or in the alternative[,] [o]rder the Board to conduct a new hearing . . . ."  Pet'r's Pet., pt.

19 1, at 22.  Since the Court finds that habeas relief should not be granted, the Court recommends

20 that declaratory and injunctive relief be denied.  *See supra* Part V.E.

21                                    VI.  CONCLUSION

22        For the foregoing reasons, IT IS HEREBY ORDERED that:

23        1.  Petitioner's request for an order to show cause is DENIED as moot;

24        2.  Petitioner's request for appointment of counsel is DENIED;

25        3.  Petitioner's request for an order initiating discovery is DENIED; and

26        4.  Petitioner's request for an evidentiary hearing is DENIED.

1    IT IS HEREBY RECOMMENDED that:

2    1. Petitioner's application for writ of habeas corpus be DENIED; and

3    2. Petitioner's claim for declaratory and injunctive relief be DENIED.

4    These findings and recommendations are submitted to the United States District Judge

5  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

6  days after being served with these findings and recommendations, any party may file written

7  objections with the court and serve a copy on all parties.  Such a document should be captioned

8  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

9  shall be served and filed within seven days after service of the objections.  Failure to file

10  objections within the specified time may waive the right to appeal the District Court's order.

11  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

12  (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

13  appealability should be issued in the event he elects to file an appeal from the judgment in this

14  case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

15  deny certificate of appealability when it enters final order adverse to applicant).

16  DATED:    September /2, 2010.

17

18

19          TIMOTHY J BOMMER
            UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26